IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**UNITED STATES OF AMERICA,**

    **Plaintiff-Appellee**

    **v.**                   **No. 25-4638**

**THOMAS C. GOLDSTEIN,**

    **Defendant-Appellant**

**UNITED STATES' OPPOSITION TO DEFENDANT'S
EMERGENCY MOTION FOR SUMMARY REVERSAL OR
<u>EXPEDITED BRIEFING AND DECISION</u>**

This interlocutory appeal involves Defendant Thomas Goldstein's attempts to be allowed to sell a home in Washington, DC—the Hawthorne Property—that he contends is the only way he can pay for counsel. But Goldstein continues to be represented in the district court by retained attorneys who have confirmed their commitment to representing him at trial regardless of the availability of funds.

As a threshold matter, this Court should strike Goldstein's filings, whether characterized as *pro se* or as constituting hybrid representation, for the same reasons the district court properly rejected Goldstein's requests for hybrid representation. If this Court allows Goldstein's motion to stand, it should be denied. Because Goldstein has

retained counsel who will proceed to trial, there is no emergency, nor is there any deprivation of counsel of choice.

Goldstein's request for summary reversal also fails because he gives short shrift to two critical issues that undermine his appeal. First, the government has not seized or restrained the Hawthorne Property; it has merely recorded a *lis pendens* notice about its forfeiture claim. Second, the Property is required as collateral for Goldstein's appearance bond because he is a flight risk, but Goldstein does not challenge that condition on appeal.

In any event, the district court correctly denied Goldstein's request below and summary reversal is plainly not warranted.

## BACKGROUND

### A)      Charges against Goldstein

Goldstein, an attorney, owned a law firm specializing in appellate and Supreme Court litigation. *See* Doc. 159,[1] ¶¶1-2. Goldstein was also an "ultrahigh-stakes poker player" who played matches domestically

---

[1] "Doc." refers to the district court docket entries. "Br." refers to Goldstein's informal brief in this Court. "Mtn." refers to Goldstein's motion to summarily reverse or expedite.

and internationally for stakes involving "millions, and even tens of millions, of dollars." *Id.* ¶6.

Between 2016 and 2022, Goldstein engaged in a tax-evasion scheme that, among other things, involved understating his gambling winnings, diverting law-firm funds to pay off gambling debts, and routing funds through his firm's IOLTA to avoid IRS levies. *See, e.g., id.* ¶24. Goldstein also controlled at least one foreign account in Montenegro, *see, e.g., id.* ¶¶34-35, and was involved in cryptocurrency transactions collectively totaling more than $9 million, *see id.* ¶¶71, 83.

In early 2021, Goldstein was looking to buy the Hawthorne Property. *See id.* ¶88. He had significant debts, including owing more than $1.3 million in federal taxes and owing nearly $15 million in gambling-related debts. *See id.* ¶¶88-89.

Goldstein's first attempt to get a loan to buy the Hawthorne Property was unsuccessful. He did not disclose his substantial debts on two loan applications, but the lender nonetheless learned about tax liens on Goldstein's then-home in Maryland and declined to approve the loans. *See id.* ¶¶95-96.

Goldstein next turned to a litigation funder ("the Funder") that had provided financing to his law firm. *Id.* ¶97. In two transactions, Goldstein borrowed $1.6 million and $4 million to allow Goldstein to buy the Hawthorne Property and to pay off the tax liabilities underlying the liens on his Maryland home. *Ibid.* As a condition of one loan, Goldstein was required to obtain a mortgage loan on the Hawthorne Property and use the loan proceeds to repay the Funder. *Ibid.* He was also required to give the Funder a deed of trust for the Hawthorne Property. *See* Doc. 175 at 8, n.3. Goldstein did not reveal to the Funder his almost $15 million in gambling-related debts. *See* Doc. 159, ¶97.

Goldstein bought the Hawthorne Property and then, as required by the agreement with the Funder, sought a nearly $2 million mortgage loan from NFM Lending. *See id.* ¶¶98, 100. Once again, Goldstein did not disclose his gambling-related debts to this new lender. *Id.* ¶ 103. Goldstein also did not disclose the debts he now owed to the Funder or a new federal tax debt of nearly $2 million. *Ibid.* This loan application was successful. *Id.* ¶102.

Based on this conduct, Count Twenty-two charged Goldstein with making false statements to NFM, in violation of 18 U.S.C. § 1014. *See*

*id.* at 50.  The indictment included a forfeiture allegation for the § 1014

charges, including Count Twenty-two.  *See id.* at 52.  The government

also filed a bill of particulars specifying that the United States would

seek to forfeit the Hawthorne Property if Goldstein were convicted on

Count Twenty-two.  *See* Doc. 21.

Around the same time, the government recorded a *lis pendens* in

the District of Columbia giving notice of its interest in the Property.

*See* Doc. 166-1.  The government has neither seized the Property nor

sought a restraining order to prevent its sale.

**B)    Goldstein was required to post the Hawthorne Property as collateral for an appearance bond**

On January 27, 2025, Goldstein was released on conditions,

including that he agree to forfeit his interest in the Hawthorne Property

if he failed to appear as required.  *See* Doc. 6 at 2.  Chief Magistrate

Judge Sullivan rejected Goldstein's subsequent effort to replace the

Hawthorne Property with South Carolina properties owned by family

members, concluding that using the Hawthorne Property, which

Goldstein owns personally, as collateral was necessary to ensure

Goldstein's appearance.  *See* Doc. 19 at 1.

The district court upheld that decision. It observed that Goldstein's personal history and characteristics "indicate that he is a significant flight risk." Doc. 76 at 6. As the court noted, Goldstein's offenses involved substantial international travel and he had "significant ties to wealthy individuals in foreign countries." *Ibid.* The court also concluded that the serious nature of the offenses and the weight of the evidence showed the need for the Hawthorne Property as collateral to ensure that Goldstein appeared as required. *See ibid.* And the court explained that Goldstein had not shown that he was without other funds, highlighting his $250,000 checking-account balance, and noting that Goldstein's true financial position—which included potential foreign assets and cryptocurrency—was unclear. *See id.* at 7.

**C)  Goldstein's counsel in the district court confirm their commitment to representing him at trial**

After a brief representation by other attorneys, since mid-February 2025, Goldstein has been represented by attorneys at Munger, Tolles & Olson LLP ("Munger Tolles"), who had also represented

Goldstein pre-indictment. *See* Doc. 167 ¶¶ 5-7[2]. Goldstein and the firm reached a flat-fee financial arrangement that same month. *See id.* ¶¶ 8-9.

Goldstein later attempted to personally argue several defense motions, while still represented by Munger Tolles. The district court rejected that effort, in line with other courts in this circuit that have "consistently declined to allow" such hybrid representation. Doc. 191 at 12. Among other factors, the court observed that there was no conflict between Goldstein and his counsel and no special need for hybrid representation, and that allowing it could muddy the factual record. *See id.* at 14.

In August 2025, Goldstein (through counsel) filed a new motion, seeking to require the government to remove its *lis pendens* and to again substitute the South Carolina properties owned by Goldstein's family members as collateral for the appearance bond. *See* Doc. 166 at 4, 22. While litigating this motion, Munger Tolles confirmed it was

---

[2] This declaration was filed *ex parte* and later provided to the government. The original filing remains under seal, so the government is not aware if it is the only document at Doc. 167 or one of several.

preparing for trial and would represent Goldstein at trial. *See* Doc. 167, ¶11. At the motion hearing, Goldstein's lead attorney also confirmed that he would continue to represent Goldstein and was not seeking to withdraw. *See* Doc. 268 at 6-7.

### D) The district court's ruling

The district court denied the new motion for "two reasons." Doc. 237 at 25 ("Mem.Op."). The court first reaffirmed its previous ruling that Goldstein "is a flight risk" and that requiring the Hawthorne Property as collateral was necessary to ensure his appearance. *Ibid.* Second, the court held that Goldstein had "not met his burden to show that he has no other assets to pay for his counsel and that the Hawthorne Property is not subject to forfeiture." *Ibid.* The court found that the factual allegations in the superseding indictment demonstrated that the Property was tainted and subject to forfeiture because, were it not for the false statements on the NFM loan application, Goldstein "would have lost his ownership interest in the Hawthorne Property." *Id.* at 27.

## ARGUMENT

This Court should strike Goldstein's motion and brief because he should not be allowed to engage in either hybrid or *pro se*

representation for this interlocutory appeal.  If this Court considers the motion, it should be denied.

## I. Goldstein's filings should be stricken as he is represented by counsel in the district court

In the ongoing district-court proceedings, Goldstein is represented by counsel, and the district court rejected Goldstein's attempt to engage in hybrid representation.  This Court should follow the same approach and strike Goldstein's filings, whether characterized as *pro se* or as hybrid representation.

It is "well-established that a criminal defendant does not have a constitutional right to 'hybrid representation.'" *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984).  Relatedly, a defendant has no constitutional right to self-representation on appeal.  *See Martinez v. Court of Appeal of Cal.*, 528 U.S. 152, 163-64 (2000).  To justify hybrid representation, a defendant must demonstrate some "special need."  *United States v. West*, 877 F.2d 281, 293 (4th Cir. 1989).

Goldstein's retained counsel filed the notice of interlocutory appeal, *see* Doc. 251, but Goldstein then filed the subject motion and brief *pro se* in this Court.  Goldstein seeks to litigate issues that retained counsel litigated in the district court.  And, in Goldstein's own

framing, those issues bear on his upcoming criminal trial, which begins January 12, 2026 (at which Goldstein will be represented by those same retained attorneys).

To ensure the integrity of that criminal trial, as well as of any direct appeal following a conviction, Goldstein must be represented in this interlocutory appeal, either by his retained trial counsel or, if necessary, by separate counsel appointed by this Court. Whether the current situation is characterized as hybrid representation (due to retained counsel noticing the appeal) or as Goldstein representing himself *pro se*, the risks to the integrity of the trial and any future appeals are several. They include issues concerning contact with a represented criminal defendant who will soon be tried and potential ineffective assistance-of-counsel claims. Even at the trial level, "the government's interest in ensuring the integrity and efficiency of the trial" can outweigh a defendant's interest in self-representation. *Martinez*, 528 U.S. at 161-62. But "[i]n the appellate context," the value of self-representation is less, and "the balance between the two competing interests surely tips in favor of the" government. *Id.* at 162.

Underscoring this conclusion is the fact that, as the district court correctly predicted, hybrid representation will "muddy the factual record" and "create factual issues." Doc. 191 at 14. Goldstein's retained trial counsel represented in a declaration submitted with the motion to sell the Hawthorne Property that "both attorneys and non-attorneys at [his] firm will continue to work diligently on Mr. Goldstein's defense." Doc. 167, ¶11. That contrasts with Goldstein's claim to this Court (Mtn. 3) that the defense team "requires assurance that they will be paid prior to the close of trial in order to participate." There is no "special need" to allow such muddying to continue. The district court is familiar with the case and it rejected Goldstein's efforts to have hybrid representation. This Court should follow suit and disallow self-representation here.

Goldstein contends (Br. 21-22) that *pro se* or hybrid representation is necessary because he cannot pay for appellate counsel. But, assuming Munger Tolles is truly unwilling to represent Goldstein on appeal, this Court could appoint Munger Tolles or other counsel as

Criminal Justice Act counsel, as this Court did in *United States v. Farmer*, 274 F.3d 800 (4th Cir. 2001).[3]

And while it is true that Goldstein has significant appellate experience (as opposed to trial experience), the district court did not reject hybrid representation simply because of Goldstein's skill set—the court was also expressly concerned that such a posture would "muddy the factual record" and "create factual issues." Doc. 191 at 14. Which, as noted above, is proving a valid concern. And although this Court is, of course, a different court, the interlocutory nature of this appeal makes those concerns just as acute. Goldstein is not seeking to litigate an appeal from a final judgment, with the factual record established, but rather an ongoing matter intertwined with his upcoming trial. The interests in protecting the integrity of all these proceedings thus still "tips in favor of the" government. *Martinez*, 528 U.S. at 162.

Accordingly, the government requests that this Court strike Goldstein's filings and order that he be represented by counsel in this

---

[3] In *Farmer*—this Court's seminal decision on handling a defendant's claims that restrained assets are needed to hire counsel—the docket reflects this Court's CJA appointment.

- 12 -

interlocutory appeal, either by his retained trial counsel or by separate counsel appointed by this Court, with full briefing on an efficient but reasonable schedule. Counsel should also have the discretion to dismiss this appeal as being without merit or improvident.

## II. There is no need for expedited consideration, and no deprivation of counsel, because Goldstein already has retained attorneys who will represent him at trial

If this Court considers Goldstein's motion, it fails for a basic reason: he is not seeking to obtain counsel. He already has attorneys who are representing him and who have agreed to represent him at trial. Thus, there is no need for expedited treatment and no grounds for summary reversal.

Munger Tolles has long represented Goldstein in connection with this criminal case, both before and after indictment. *See* Doc. 167 at 1-3. After indictment, Goldstein and Munger Tolles agreed to a flat-fee arrangement to cover "all post-indictment work, through trial." *Id.* ¶ 9. Goldstein has made at least one substantial payment toward that flat fee. *Ibid.* Munger Tolles has continued to represent Goldstein and has indeed confirmed that the firm will continue to work on preparing for Goldstein's trial. *Id.* ¶ 11; *see also* Doc. 268 at 7.

- 13 -

There is thus no emergency. Goldstein has already retained his counsel of choice, who will represent him at trial. What Goldstein's interlocutory appeal presents is not a question of needing funds to hire counsel he cannot otherwise retain but simply a billing issue about the timing of payment for his existing attorneys.

Goldstein's attempt to proceed *pro se* reinforces this conclusion. If his retained counsel thought that the immediate sale of the Hawthorne Property was so critical to payment, it would be in their own interest to pursue the interlocutory appeal as counsel. And if Goldstein were truly indigent, and an appeal were outside the scope of the representation, the firm could also seek to be appointed under the CJA to represent Goldstein either in his criminal trial or in this appeal. *See United States v. Ballard*, 727 F. App'x 757, 759 (4th Cir. 2018) (noting that court appointed previously-retained counsel after defendant's assets were seized and he could no longer afford to pay his attorney).

That Goldstein will be represented by counsel at trial regardless also demonstrates that Goldstein's underlying Sixth Amendment claim is meritless. He does not need funds to hire counsel because he already has counsel. When this Court has considered claims like those

- 14 -

Goldstein seeks to raise, the defendant was seeking to retain counsel, not alleging that they were behind on their payments with existing counsel. *See, e.g., Farmer*, 274 F.3d at 804 (defendant was "without funds to hire the attorney of his choice"); *United States v. Miller*, 911 F.3d 229, 231 (4th Cir. 2018) (defendant was claiming funds were needed to "retain counsel of his choice").[4]

The record already demonstrates that Goldstein is not being deprived of his counsel of choice, but even if Munger Tolles had not confirmed they will represent Goldstein for trial, the result would be the same because the firm would not be allowed to withdraw at this late stage. "[T]he fact that the defendant may owe retained counsel fees is not, in itself, a sufficient reason to substitute counsel." *United State v. Shawndale Saunders*, No. 5:08CR26-01, 2009 WL 10705038, at *2

---

[4] As noted above, this Court appointed CJA counsel for Farmer's appeal. In *Miller*, counsel represented the defendant only at the outset of his criminal case and pursued the appeal to release funds. That tentative representation, as the defendant understood, "depended on whether sufficient funds were made available for payment of fees and other costs and his case remains stayed with no trial date pending." Doc. 55 in Case No. 17-cr-213 (E.D. Va.). Once this Court upheld the seizure of Miller's assets, that attorney withdrew with the defendant's consent and the district court appointed a public defender.

(N.D.W. Va. Jan. 6, 2009); *see also United States v. Parker*, 439 F.3d 81, 104 (2d Cir. 2006) (The "non-payment of legal fees, without more, is not usually a sufficient basis to permit an attorney to withdraw from representation.") (internal citations omitted).[5]

Because Goldstein has retained counsel, his Sixth Amendment claim fails and there is also no exigency. His requests for summary reversal and for an expedited appeal in the alternative should both be denied.

### III. The government has not seized the Hawthorne Property, which is separately subject to an appearance bond that Goldstein has not challenged on appeal

Goldstein's request for summary reversal also fails because he largely ignores two critical issues that undermine his argument. First, the government is not restraining the Hawthorne Property for forfeiture—it merely filed a *lis pendens* providing notice of its interest

---

[5] Goldstein also asserts (Mtn. 2) that his proposed experts must be paid. But the record does not indicate that the experts are unwilling to work, and Goldstein also appears to own a watch whose value would cover the expert costs. *Compare* Doc. 268 at 4 *with* Doc. 167, ¶ 12. Moreover, Goldstein does not cite any caselaw indicating the right to counsel extends to paying expert witnesses. And all this assumes that Goldstein's proposed experts would be permitted to testify at trial—an issue currently being litigated below.

in the Property.  Second, what truly might restrict Goldstein from selling the Property is his appearance bond, as the district court has required the Property as collateral given Goldstein's significant risk of flight.  But Goldstein has not challenged his conditions of release on appeal.  Either of these issues would be a basis for affirming the district court, and Goldstein's cursory treatment of these critical issues demonstrates that summary reversal cannot be granted.

The government has not seized the Hawthorne Property, nor has it obtained a restraining order preventing it sale.  Rather, the government has only recorded a *lis pendens* to give notice of its claimed interest in the Property.  This situation is thus very different from situations in which this Court has considered a potential Sixth Amendment claim because the government had, in fact, seized or restrained the assets in question.  *See*, *e.g., Miller*, 911 F.3d at 230; *Farmer*, 274 F.3d at 801.  A *lis pendens* simply provides notice, and does not rise to the level of seizure or restraint.  *See*, *e.g.*, *United States v. Register*, 182 F.3d 820, 834-37 (11th Cir. 1999) (rejecting claim that *lis pendens* violated Fifth and Sixth Amendments because such a notice is not a seizure); *Diaz v. Pataki*, 368 F. Supp. 2d 265, 274 (S.D.N.Y. 2005),

*aff'd sub nom. Diaz v. Paterson*, 547 F.3d 88 (2d Cir. 2008) (collecting cases that *lis pendens* is not a seizure).

If anything restricts Goldstein from selling the Property, it is that the Property is collateral securing his appearance bond due to his being a flight risk. But Goldstein does not challenge that on appeal. Thus, even if this Court held that Goldstein was entitled to a *Farmer* hearing or even that the Property was untainted, it would not materially change Goldstein's situation. He would still be required to post the Property as collateral based upon the unchallenged determination—made by the magistrate judge and twice made by the district court—that he is a flight risk and that the Property Goldstein personally owns is necessary collateral to ensure his appearance at trial.

Goldstein only makes a passing reference to his conditions of release, asserting in a footnote that the district court "did not hold that if [he had] the Sixth Amendment right to sell the house, then it nonetheless may still be restrained under the Bail Reform Act." Br. 11, n.7. But the district court expressly found "two reasons" for denying Goldstein's motion to sell the Hawthorne Property, with the first reason being the conditions of release, which the court reaffirmed. Mem.Op. at

- 18 -

25. If the district court thought a potential Sixth Amendment interest trumped those conditions, it would not have treated them as an independent basis to deny Goldstein's motion. Nor does Goldstein now cite any law suggesting that the conditions would be invalid.

Goldstein's cursory treatment of these two key issues provides additional, independent grounds to deny his motion for summary reversal.

### IV. The district court properly denied a *Farmer* hearing and correctly concluded that the Hawthorne Property is subject to forfeiture if Goldstein is convicted

If this Court reaches the issue, it should hold that the district court's forfeiture rulings were correct. Goldstein has not carried his burden to show that he lacks alternative funds to pay for counsel and that the Hawthorne Property is not subject to forfeiture. At a minimum, summary reversal on these issues is not warranted.

A defendant does not have a right to use forfeitable funds to hire counsel. *See Caplin & Drysdale v. United States,* 491 U.S. 617, 630 (1989). In *Farmer*, this Court established the framework for assessing a defendant's claim that "he is entitled to fund his criminal defense using some or all of the assets seized" by the government for potential

forfeiture.  *Farmer*, 274 F.3d at 801.  To obtain a pretrial evidentiary hearing, Goldstein must make a twofold showing: (1) that, without the restrained or seized funds, he cannot hire counsel; and (2) that he has made a sufficient showing that the government might have restrained legitimate assets.  *See id.* at 804, 806-07; *see also, e.g., United States v. Johnson*, 683 F. App'x 241, 248 (4th Cir. 2017).

**A.  Goldstein has not shown that he lacks alternative funds**

For a pretrial determination, Goldstein bears the burden of demonstrating that selling the Hawthorne Property is necessary to paying for his counsel and that he does not have alternative means of paying.  If Goldstein "possessed the means to hire an attorney independently of assets that were seized," then he lacks a sufficient interest for a pretrial hearing.  *Farmer*, 274 F.3d at 804.  As the district court concluded, Goldstein did not meet "his burden to show that he has no other assets to pay for his counsel."  Mem.Op. at 25.

While Goldstein has asserted that he has minimal assets left, his true financial position is opaque at best.  *See also* Doc. 76 at 7.  As the indictment charged, Goldstein has controlled at least one foreign financial account and has extensively used cryptocurrency.  *See* Doc.

159, ¶¶24, 34-35, 71, 83.  The government also recently learned that
Goldstein still owned a watch worth roughly $90,000 to $110,000 that
he had not disclosed.  *See* Doc. 268 at 4.

Goldstein's financial picture is thus unclear.  But he is the one
who bears the burden of demonstrating that he has no other sources of
paying for counsel besides the Hawthorne Property.  And the district
court concluded that he failed to meet that burden.  *See* Mem.Op. at 25.
That ruling is the sort of quintessentially factual determination that
this Court reviews only for clear error.  *Cf. Miller*, 911 F.3d at 232.  Yet
Goldstein makes no real effort to demonstrate that the court erred in its
determination, much less clearly so (and he falls especially short of
showing that any error was so clear as to warrant summary reversal).

## B. The Hawthorne Property is a tainted asset

The district court also correctly held that the Hawthorne Property
is a tainted asset, subject to forfeiture if Goldstein is convicted on Count
Twenty-two.  *See* Mem.Op. at 25-27.  Were it not for the loan obtained
from NFM based on false statements, Goldstein would have lost his
ownership in the Property, meaning that the Property is the proceeds,
or traceable to the proceeds, of that mortgage fraud.

Under 18 U.S.C. § 982(a)(2), Goldstein must forfeit "any property constituting, or derived from, proceeds [he] obtained directly *or indirectly*, as the result of certain enumerated offenses," including false statements on a loan application in violation of 18 U.S.C. § 1014. *United States v. Farkas*, 474 F. App'x 349, 359 (4th Cir. 2012) (emphasis added). Courts agree that "proceeds" in the criminal forfeiture context is property a defendant would not have had "but for" the criminal conduct. *United States v. Jones*, 622 F. App'x 204, 207 (4th Cir. 2015); *United States v. Shah*, 84 F.4th 190, 252 (5th Cir. 2023) (explaining that inquiry "is whether the defendant would have received the property 'but for' his criminal conduct").

That the Hawthorne Property is tainted follows from a straightforward application of but-for causation. Goldstein's agreement with the Funder required him to provide the Funder a deed of trust for the Property to secure its loan. The agreement also required him to obtain a mortgage on the Property, which the indictment alleges he did by lying to NFM. And the agreement required him to use the proceeds of that loan to pay off the debt to the Funder. If Goldstein had failed to pay off the Funder, he "would have lost his ownership interest in the

Hawthorne Property." Mem.Op. at 27. In other words, Goldstein's false statements to NFM for a mortgage loan were what allowed him to retain the Property. But for that fraud, he would not still have the Property.

These facts resemble those cases in which courts have upheld forfeiture of real estate because defendants repaid a lender with illicit proceeds. *See, e.g., United States v. Caspersen*, 275 F. Supp. 3d 502, 504 (S.D.N.Y. 2017); *United States v. Rafferty*, No. 04-20478-CR, 2007 WL 3231830, at *3 (S.D. Fla. Oct. 30, 2007). The situation here is also analogous to this Court's decision in *Farkas*, in which it upheld the district court's determination that the defendant's fraudulent activity allowed his business to remain solvent, and that payments from that business were subject to forfeiture, since but for the fraud the business would be insolvent. *Farkas*, 474 F. App'x at 360. Similarly, were it not for the fraudulently obtained mortgage loan, Goldstein would have been in default with the Funder and lost the Property.

Goldstein's primary contention (Br. 3, 14-16), is that the district court reversed the burden of proof and that the government was required to show the Property was forfeitable, rather than Goldstein

showing the Property was wrongly restrained.  But *Farmer* made clear that district courts "enjoy broad discretion" to determine whether hearings are needed and that a defendant must do more than simply request a hearing.  *Farmer*, 274 F.3d at 805-06.  In *Farmer*, this Court found that the defendant had met that burden based on a sworn affidavit from counsel indicating that government agents admitted "that many seized assets were legitimate." *Id.* at 806.  This Court has also consistently interpreted *Farmer* as requiring a defendant to make a showing that assets were wrongly restrained.  *See, e.g., United States v. Cohen*, 888 F.3d 667, 673 n.4 (4th Cir. 2018); *United States v. Peters*, No. 19-4718, 2021 WL 4099907, at *2 (4th Cir. Sept. 9, 2021) (noting need for threshold showing); *Johnson*, 683 Fed. App'x at 248 (similar). Below, even Goldstein recognized that a threshold showing was required.  *See* Doc. 166 at 22.

Goldstein's reliance (Br. 14-15) on *United States v. Harvey*, 814 F.3d 905 (4th Cir. 1987) is misplaced.  *Farmer* discussed *Harvey*, *see* 274 F.3d at 803—which was decided before *Caplin & Drysdale*—and concluded that defendants must make some showing that the alleged restraint was improper, *see id.* at 805-06.

Goldstein also contends (Br. 16-19) that the theory of forfeiture is impermissibly attenuated. But that Goldstein would lose the Property if he did not follow through with obtaining a loan and using that loan to pay the Funder is a straightforward theory of but-for causation. It does not rely on some implausible chain of logic but on a simple if-then: if Goldstein did not pay, then the Funder would secure ownership.

Even if the fact pattern does not precisely mirror some other case, that is hardly a fatal flaw. More importantly, Goldstein points to no case—and particularly no case from this Court—rejecting a similar theory on facts like this. At best for Goldstein, it might be an open question for this circuit—but an open question is not grounds for summary reversal.

Finally, Goldstein maintains (Br. 12-14, 20-21) that the government's theory contradicts his agreements with the Funder. This is a new theory that Goldstein did not argue below. *Compare* Doc. 166 at 6-11, 22.[6] So at best for him, this Court would apply plain-error

---

[6] Goldstein's primary argument below was that the Property was obtained with untainted funds. But that ignores that it was the subsequent mortgage fraud that allowed him to retain the Property, rendering it tainted.

review.  And the district court's determination is a factual finding that, even if preserved, would be reviewed for clear error.  *See Miller*, 911 F.3d at 232.  Plain-error review of a factual finding is not the stuff of which summary reversal is made.

Moreover, Goldstein's arguments depend in part on challenging the mortgage-fraud allegations in the indictment.  But the grand jury's probable-cause findings on those allegations cannot be contested pretrial.  *See Kaley v. United States*, 571 U.S. 320, 322 (2014).  And while the indictment itself did not expressly discuss the consequences of default, Goldstein's notion that the Funder would merely have recorded a deed of trust misses the mark.  For one, recording the deed of trust would have given the Funder a legal claim to the Property.  Second, if Goldstein failed to live up to his end of the bargain, it is quite reasonable that the Funder would have pursued its interests and sought to obtain full ownership.  The district court certainly did not clearly and plainly err in concluding that Goldstein would lose the Property if he failed to pay the Funder back with the (tainted) loan proceeds.

In sum, the district court did not err in concluding that Goldstein failed to carry his burden of showing that the Property was improperly restrained and that he had no other assets to pay counsel. And, regardless, he falls well short of showing that summary reversal is appropriate.

## CONCLUSION

Goldstein's *pro se* motion for summary reversal or expedited briefing and decision should be stricken, with Goldstein ordered to obtain retained or appointed counsel under penalty of dismissal. Should counsel determine to pursue this interlocutory appeal, an expedited but reasonable briefing schedule should be ordered.

If this Court considers the *pro se* motion for summary reversal or for expedited briefing, it should be denied.

Respectfully submitted,

s/ Jason Poole

| | |
|---|---|
| S. ROBERT LYONS | (202) 307-6512 |
| *Deputy Chief* | |
| *Tax Section, Appellate Unit* | |
| KATIE BAGLEY | (202) 616-3854 |
| JOSEPH B. SYVERSON | (202) 307-6508 |
| JASON POOLE | (202) 514-0302 |
| *Attorneys* | |
| *Criminal Division* | |
| *U.S. Department of Justice* | |

- 27 -

*Post Office Box 972*
*Washington, D.C. 20044*

DATED: December 3, 2025

## CERTIFICATE OF COMPLIANCE

This response complies with the length limitation of Federal Rule of Appellate Procedure 27(d)(2) because it is 5,196 words in length, excluding the parts excluded under Rule 32(f).

This response complies with the typeface and type-style requirements of Rule 27(d)(1)(E) because it has been prepared in a 14-point, proportionally spaced typeface (Century Schoolbook) using Word for Microsoft 365.

<u>s/ Jason Poole</u>
JASON POOLE
    *Attorney for the United States*

DATED: December 3, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2025, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system.

Counsel for defendant and defendant himself are all registered ECF

users and will be served by the ECF system.

s/ Jason Poole

JASON POOLE

*Attorney for the United States*

DATED: December 3, 2025